Kevin Koelbel, SBN 016599
Erin Rose Ronstadt, SBN 028362
OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745
(602) 761-4443 Fax
kevin@oberpekas.com
erin@oberpekas.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joan Weigand-Camardo, a married woman,<br><br>    Plaintiff,<br><br>v.<br><br>Aetna Life Insurance Company, a plan fiduciary,<br><br>    Defendant. | No.<br><br><br>**COMPLAINT** |

For her claims against Defendant Aetna Life Insurance Company ("Aetna"), Plaintiff Joan Weigand-Camardo ("Ms. Weigand" or "Plaintiff") alleges as follows:

**JURISDICTION, VENUE AND PARTIES**

1.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.

2.      Effective July 18, 2011, Aetna issued an insurance policy, Group Policy Number GP-476626 (the "Policy"), to Dell Inc. ("Dell").

3.      Dell Inc. Comprehensive Welfare Benefits Plan Number 501 (the "Plan") is a purported ERISA benefit plan established and maintained by Dell for the benefit of its employees.

4.      The Plan provides a comprehensive selection of employee welfare benefits including, but not limited to, medical, dental, vision, life, short-term disability ("STD"), long-term disability ("LTD"), and accidental death and dismemberment.

5.     At all relevant times, Ms. Weigand was a participant and beneficiary of the Plan as an employee of Dell.

6.     Dell was the Plan Administrator, Plan Sponsor, and Employer.

7.     At all relevant times, Aetna administered claims for Dell under the Plan, acted on behalf of the Plan, and acted as an agent for Dell.

8.     Aetna fully insures and administers LTD benefits under the Plan by virtue of the Policy.

9.     Aetna also administers Dell's self-funded STD benefits, which are funded from Dell's general assets.

10.     As administrator of both STD and LTD benefits, Aetna determines whether a participant is eligible for either STD or LTD benefits.

11.     Ms. Weigand is a married person. She currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all relevant times.

12.     Aetna, a large corporation, has its principal place of business in the state of Connecticut. Aetna is licensed and authorized to do business in Maricopa County, Arizona, and resides and is found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

13.     This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), - 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

14.     Venue is proper in this Court under ERISA, 29 U.S.C § 1132(e)(1), and 28 U.S.C. § 1391(b).

15.     Aetna is a fiduciary of the Plan. Aetna acted as Dell's agent to make final decisions to pay disability benefits for the Plan and to administer the Plan. Accordingly, Ms. Weigand is informed and believes that Aetna is either a "named fiduciary" of the Plan, pursuant to 29 U.S.C. § 1133(2); a "deemed fiduciary" pursuant to 29 U.S.C. § 1002(21)(A); or a "designated fiduciary" pursuant to 29 U.S.C. § 1105(c)(1)(B).

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

16.   Aetna had actual or apparent authority to act as a fiduciary on behalf of the Plan.

17.   Aetna's third-party vendors had actual or apparent authority to act as fiduciaries on behalf of the Plan and administered the Plan in providing services to Aetna.

## GENERAL ALLEGATIONS

### *The Plan*

18.   To qualify for LTD benefits under the LTD Policy, Ms. Weigand has to satisfy Aetna's "Test of Disability," which means that, for the first twenty-four (24) months,  "[she] cannot perform the **material duties** of [her] **own occupation** solely because of an **illness, injury** or disabling pregnancy-related condition; and [her] earnings are 80% or less of her **adjusted predisability earnings**."

19.   Own Occupation is defined as "[t]he occupation that [Ms. Weigand] is routinely performing when [her] period of disability begins. [Her] occupation will be viewed as it is normally performed in the national economy instead of how it is performed [f]or [her] specific employer; or [a]t [her] location or work site; and [w]ithout regard to [her] specific reporting relationship."

20.   If the Test of Disability is met, LTD benefits are then payable after the "Elimination Period" is satisfied. The Elimination Period "is the amount of time [Ms. Weigand] must be disabled before benefits start."  Under the terms of the LTD Policy, the Elimination Period was 180 days.

21.   Specifically, Ms. Weigand's Elimination Period was May 22, 2012 through July 22, 2012, and continued December 6, 2012 through April 2, 2013. Her LTD benefits became payable effective April 3, 2013.

22.   After twenty-four (24) months of receiving LTD benefits, "[Ms. Weigand] meets the Plan's Test of Disability on any day [she is] unable to work at any **reasonable occupation** solely because of an **illness, injury** or pregnancy-related condition."

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

23.     Reasonable Occupation is defined as "any gainful activity: [f]or which [Ms. Weigand is], or may reasonable [sic] become, fitted by education, training, or experience; and [w]hich results in, or can be expected to result in, an income of more than 80% of [her] **adjusted predisability earnings**."

24.     If eligible, the Policy provides Ms. Weigand with up to sixty (60) percent of her Base Monthly Earnings from all sources of income.

25.     Ms. Weigand was required to and did participate in an administrative appeal process. She had no other administrative appeal options available to her and filed this lawsuit under ERISA.

### *Ms. Weigand's Employment and Claims for STD and LTD Benefits*

26.     Ms. Weigand began working as a Project Manager for Advanced Receivables Strategy, Inc. ("ARS") in October 2000.

27.     On or around July 26, 2001, ARS became a subsidiary of Perot Systems Corporation ("Perot Systems"). Dell acquired Perot Systems on September 21, 2009.

28.     Ms. Weigand became an employee of Dell through the acquisition, and she continued the same job duties under a different title, Project Director III.

29.     Through her employment with ARS, Perot Systems and Dell, Ms. Weigand collectively had over ten years of experience as a Project Director III.

30.     As a Project Director III, Ms. Weigand was responsible for handling multiple advanced-level priorities, including but not limited to: managing, monitoring and analyzing healthcare accounts receivables, corporate reports, financial records and other revenue operations; ensuring accounting procedures were handled timely and accurately; supervising and advising team members and customers; and overseeing lengthy, time-sensitive projects.

31.     Ms. Weigand's position was extremely demanding, requiring constant multi-tasking and strict attention to detail with little to no room for error.

32.     Ms. Weigand performed her job as is required in the national economy.

33.     In 2012, Ms. Weigand underwent a rotator cuff repair of her right shoulder. She received STD benefits between May 22 and July 22, 2012 to recover from the procedure.

34.     Soon after returning to work, Ms. Weigand began having complications from the procedure but continued to work through the pain for as long as she could.

35.     Unfortunately, due to a significant decline in her physical and mental health, Ms. Weigand stopped work on December 5, 2012.

36.     Ms. Weigand received STD benefits again from December 6, 2012 through April 2, 2013.

37.     On March 28, 2013, Aetna conducted a "LTD Triage Review" of her claim. On April 3, 2013, Aetna determined Ms. Weigand was entitled to LTD benefits.

38.     Throughout the course of Ms. Weigand's LTD claim, Aetna conducted numerous reviews and continued to find her Disabled under the Plan.

39.     Aetna's claims analyst, Maribel Amor, handled Ms. Weigand's LTD claim and conducted several file reviews.

40.     On March 7, 2014, Ms. Amor conducted a review of Ms. Weigand's medical records and stated, "This claimant has multiple [diagnoses] and the combination of impairments may make claimant unable to perform **any** work." (emphasis added).

41.     On March 24, 2014, Ms. Amor stated that Ms. Weigand had "a less than sedentary level of functionality" due to her restrictions and limitations of "no lifting more than one pound, no computer data entry tolerance, no walking greater than 50 feet, sitting for greater than 10 minutes," which was based on treating physician, Dr. Wadowski's March 24, 2014 Attending Physician Statement.

42.     On or around September 29, 2014, Aetna began its review of continued eligibility into the any-occupation period, which was scheduled to begin on April 3, 2015.

43.     LTD Benefit Manager Shawndra Lee handled Ms. Weigand's LTD claim during the review into the any-occupation period.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

44.    Ms. Lee performed several medical records reviews and, on multiple occasions, stated that the medical records continued to support Ms. Weigand's impairments and inability to work.

45.    On January 27, 2015, Ms. Lee conducted a telephone interview with Ms. Weigand.

46.    During the interview, Ms. Weigand discussed her continued health problems, the treatment she was receiving for her conditions, and provided an updated list of her treating providers.

47.    On February 17, 2015, Ms. Lee requested medical information from only three (3) of Ms. Weigand's treating providers: Drs. Bruns, Wadowski, and Wells.

48.    In response to Ms. Lee's request for medical records, Ms. Weigand's orthopedic physician, Dr. Brad Bruns, stated in a letter dated March 3, 2015 that "[u]nfortunately, **even sedentary work duties would be very difficult for her**," due to the fact that she was wearing arm braces on both wrists, and required further treatment. (emphasis added).

49.    Dr. Bruns also provided a Capabilities and Limitations Worksheet dated March 18, 2015, which listed Ms. Weigand's restrictions and limitations with respect to her "hands and right shoulder only." Dr. Bruns further stated, "[Ms. Weigand] has **additional medical issues regards to [sic] disability**." (emphasis added).

50.    Aetna did not seek clarification regarding Ms. Weigand's "additional medical issues" from any of her other treating providers.

51.    Aetna also did not order additional testing, such as functional capacity evaluations or independent medical examinations.

52.    Instead, Aetna ordered a background check to determine if Ms. Weigand was engaging in any form of business activity. The report concluded that Ms. Weigand was not engaging in any form of work.

53.    Tammy Manente, LPN conducted a file review for Aetna on May 1, 2015.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

54.    Ms. Manente focused only on Dr. Bruns assessment and ignored the other medical evidence on file. She concluded that Ms. Weigand "ha[d] seated capacity with limited use of her hands due to her braces" and could therefore perform some level of sedentary work.

55.    Ms. Manente reached this conclusion without additional restrictions and limitations from Ms. Weigand's other treating providers besides Dr. Bruns.

56.    Ms. Manente neither contacted Ms. Weigand's treating providers, nor did she refer Ms. Weigand's claim for a physician review.

57.    Ms. Manente instead referred Ms. Weigand's claim out to a vocational review consultant ("VRC") to perform a transferable skills analysis (the "TSA").

58.    The VRC Referral from Aetna did not provide an accurate description of Ms. Weigand's complete functional capacity in light of Aetna's failure to seek clarification from her other treating providers; it merely stated, "[she] can work in a seated capacity with limited use of her hands due to her braces."

59.    The TSA report dated May 13, 2015 found alternative occupations based on Aetna's insufficient analysis of Ms. Weigand's restrictions and limitations.

60.    As a result, the TSA report was flawed and unreliable.

### Termination of LTD Benefits

61.    On May 20, 2015, less than three (3) weeks after Ms. Manente began her review, Aetna notified Ms. Weigand by letter that it terminated LTD benefits (the "Denial").

62.    Aetna's decision was based solely on the flawed TSA.

63.    Aetna ignored or otherwise avoided the assessments of Ms. Weigand's treating providers, as well as the collective medical evidence on file.

64.    In response to the Denial, Ms. Weigand's neurologist, Dr. Overall, provided a statement dated May 26, 2015, stating that her neurological condition "mainly affects her arms and feet" and "is painful and is worsened by sitting in one position for too long." He further stated that the collective conditions for which he

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

treated her "cause impairment in her daily activities and may limit the amount she can work."

65.     On May 26, 2015, Aetna issued the same Denial, although it is unclear as to why.

66.     Ms. Weigand first appealed in a letter dated June 2, 2015.

67.     Aetna confirmed receipt of her appeal request in a letter dated June 4, 2015.

68.     On June 23, 2015, Ms. Weigand subsequently requested a copy of her claim file.

69.     Subsequent letters from Aetna dated July 2 and August 28, 2015 indicated that Ms. Weigand requested an extension of time in order to review her claim file and supplement her appeal.

70.     Aetna granted the requests and provided a final appeal deadline of September 11, 2015.

71.     Ms. Weigand timely appealed Aetna's decision, providing supplemental medical records that were not included in Aetna's claim file disclosure.

72.     Aetna assigned Ms. Weigand's appeal to Disability Appeals Specialist Charlai Lang.

### *October 22, 2015 Peer Review and October 28, 2015 Final Denial*

73.     Ms. Lang ordered a peer review, which was assigned to Dr. Joseph Rea, who specializes in Occupational Medicine.

74.     Dr. Rea provided a report on October 22, 2015, which included an incomplete review of Ms. Weigand's medical records since October 2012.

75.     Although Dr. Rea considered Dr. Overall's May 26, 2015 supporting statement, he misconstrued some of the opinions addressed in the letter. For example, Dr. Overall indicated that her neurological issues primarily impacted her arms and feet; however, Dr. Rea misstated that Ms. Weigand's neurological disorder only impacted her arms. Additionally, Dr. Overall indicated that her conditions "limit[ed] the amount she

[could] work." Dr. Rea again twisted his words and stated that her impairments "would limit daily activities *besides* working." (emphasis added).  Although he prepared an inaccurate report, Dr. Rea did acknowledge Dr. Overall's assessment that Ms. Weigand's neurological conditions made it very painful for Ms. Weigand to sit for long periods of time.

76.     Dr. Rea reached out to Dr. Bruns' office and spoke with his medical assistant, Julie, on October 15, 2015. Based on Dr. Rea's report, "Julie commented that there were **more substantial and pressing issues as to the question of impairment** but, with respect to the shoulder . . . Julie advised that . . . reaching and lifting would be limited with the affected shoulder." (emphasis added).

77.     Dr. Rea spoke with one of Ms. Weigand's neurologists, Dr. Pena, on October 19, 2015. Dr. Pena indicated that she had only seen Ms. Weigand twice, and that her pain issues would need to be evaluated further. She informed Dr. Rea of upcoming tests that were being scheduled. Dr. Pena could not opine as to Ms. Weigand's functionality, since her conditions were "not fully understood as of yet."

78.     Dr. Rea attempted to call Dr. Wadowski on October 14, 16 and 19, 2015. On the third attempt, he was told that, "Dr. Wadowski had been very busy the other day and was not able to call [him] back, but that she would be reminded of this so that she could make the call." No further attempts were made to speak with Dr. Wadowski.

79.     Dr. Rea made no attempts to contact any of Ms. Weigand's other treating providers.

80.     Dr. Rea concluded that Ms. Weigand had "physical functional impairment from October 6, 2012 through December 31, 2015" and found limitations that were inconsistent with the opinions and assessments from her treating providers. Specifically, he found there were "no indicated limitations regarding sitting," which is contrary to the opinions of her treating providers.

81.     Dr. Rea's review of the medical records did not include any of the previous attending physician's statements or capabilities and limitations provided by Ms.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

Weigand's treating providers throughout the course of her LTD claim - all of which provided restrictions and limitations that would prevent Ms. Weigand from performing any occupation under the Plan.

82.   Dr. Rea's report did not specifically indicate whether Ms. Weigand was capable of sedentary work, regardless of the fact that his restrictions and limitations were flawed.

83.   Dr. Rea's restrictions and limitations were different than the limitations provided by Aetna for the TSA report.

84.   On October 27, 2015, Ms. Lang upheld the termination of LTD benefits based on Dr. Rea's findings by stating, "medical supports limitations but not for sedentary work vrc found in the transferable skills analysis."

85.   Management reviewed the decision, who agreed with the decision and further stated, "Vrc completed a transferable skills analysis which found jobs that would all [sic] ee to rtw in a safe capacity based on r/l's, wage and work history therefore although medical supports functional limitations ee has capabilities that would not suggest ee is totally disabled and unable to function in any capacity."

86.   Aetna upheld its decision in a letter dated October 28, 2015 (the "Final Denial").

87.   Aetna's decision was solely based on the inconsistent and contradictory limitations set forth in Dr. Rea's report, as well as the TSA Report that was based on completely different limitations set forth by Aetna. It was also based on an inexcusable and intentional failure on Aetna's part to consult with all of Ms. Weigand's treating physicians or to only speak with a physician's office and not the physician personally.

### *Ms. Weigand's Social Security Disability Insurance ("SSDI") Benefits*

88.   Almost immediately after Aetna's April 2013 approval of Ms. Weigand's LTD benefits, Aetna began efforts to reduce monthly LTD payments by requiring Ms. Weigand to initiate a claim for SSDI benefits through its preferred third party vendor, Allsup.

-10-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

89. If approved for SSDI benefits or if a claimant otherwise refuses to seek SSDI benefits, Aetna offsets its payments by the amount of the SSDI benefit.

90. Requiring claimants to seek SSDI government benefits and then taking an offset for those benefits results in significant savings to Aetna.

91. Aetna requires claimants to apply for SSDI benefits so that it can recoup an offset, even though the definition of disability under the Plan is different than the Social Security Administration's ("SSA") requirements for disability.

92. Aetna provided Ms. Weigand with a deadline by which to file her SSDI application; if she did not meet this deadline, then Aetna would estimate the SSDI award and take an offset, regardless of whether she applied for the government benefits.

93. Ms. Weigand was in the process of moving from a two-story house to a single-story home due to her declining health, and she requested an extension to file the SSDI application.

94. Though Aetna granted a short extension, it threatened to take an estimated offset if she did not file the application before the expiration of the extension period.

95. Due to the stress of the move, Ms. Weigand was unable to file her SSDI application within Aetna's time frame, and Aetna immediately began taking an estimated SSDI offset.

96. Aetna later reimbursed Ms. Weigand after she filed the application.

97. After Ms. Weigand filed her initial application, she decided to wait for the SSDI decision before retaining Allsup.

98. Aetna and Allsup were in frequent communication about the SSDI application process, even before Allsup formally represented Ms. Weigand.

99. After SSA denied Ms. Weigand's initial SSDI application, she retained Allsup to assist with the reconsideration.

100. Allsup filed for reconsideration on behalf of Ms. Weigand on March 14, 2014.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

101.    Allsup continued to communicate with Aetna on the status of Ms. Weigand's SSDI reconsideration filing.

102.    On January 28, 2015, the SSA awarded Ms. Weigand SSDI benefits, finding that Ms. Weigand was not capable of any sedentary work in the national economy.

103.    SSA determined that Ms. Weigand does not have the residual functional capacity to sustain a forty-hour workweek in light of the *multitude* of her impairments.

104.    Allsup notified Aetna of the SSDI award, and Aetna immediately began collection efforts on the overpayment of LTD benefits due to the SSDI award.

105.    Despite taking the offset in order to reduce monthly benefits and collecting an overpayment, **Aetna never requested Ms. Weigand's SSDI file before terminating her LTD benefits.**

106.    Ms. Weigand complied with Aetna's request and began making reimbursements to Aetna through a withholding of her monthly LTD benefits.

107.    Less than two (2) weeks after the Final Denial, Aetna continued its collection efforts in a letter dated November 6, 2015.

108.    The letter stated that, because she was no longer receiving LTD benefits, Aetna could no longer recover the remaining overpayment from monthly LTD benefits and therefore needed to make new repayment arrangements.

109.    In a letter dated November 11, 2015, Aetna confirmed Ms. Weigand's agreement to pay the remaining overpayment balance in monthly installments.

110.    Ms. Weigand immediately began making monthly installments, despite the fact that she was not receiving LTD benefits.

111.    On January 6, 2016, legal counsel notified Aetna it represented Ms. Weigand on her LTD claim.

112.    Despite knowing that Ms. Weigand had legal representation, Aetna continued to communicate directly with Ms. Weigand on overpayment efforts and to collect monthly overpayment installments.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

## COUNT I
### (Recovery of Plan Benefits)

113.    All other paragraphs are incorporated by reference.

114.    The Plan is an Employee Welfare Benefit Plan as defined by ERISA, 29 U.S.C. § 1002.

115.    Aetna is a Plan fiduciary of the Plan under ERISA.

116.    The Plan represents LTD coverage and a promise to provide LTD benefits until Ms. Weigand is no longer disabled under the terms of the Plan.

117.    Under the terms of the LTD Plan certain administrative and fiduciary duties are reserved to the Dell Inc. Benefits Administration Committee ("Committee"), a committee appointed by Dell.

118.    The Committee is a named fiduciary of the LTD Plan.

119.    The Committee was responsible for establishing procedures for claims handling, claim denials, and appeals of denials.

120.    The Committee is responsible for general Plan administration and has all of the powers necessary to administer the Plan, including the sole discretion to: interpret all Plan provisions, decide all matters of fact in granting or denying claims under the Plan, determine Plan eligibility, and determine the amount of and authorize Plan payments.

121.    The LTD Plan reserves to the Plan Administrator exclusive discretion to determine eligibility for benefits.

122.    Under the LTD Plan, the Committee could delegate claims determinations to a claims administrator.

123.    Any dispute as to eligibility, type or amount of Benefits under the Plan, or any amendment thereto shall be resolved by the designated named fiduciary, in its sole and absolute discretion, and its decision shall be final and binding on all parties to the dispute.

124.    On information and belief, the Committee did not properly delegate its fiduciary duty to administer claims in accordance with the Plan terms to Aetna.

125.    On information and belief, the Plan Administrator did not properly delegate any fiduciary duties reserved to the Plan Administrator to Aetna or any other entity.

126.    Ms. Weigand's claim is subject to *de novo* review in this court.

127.    Ms. Weigand became disabled in 2012 and continues to be disabled.  Due to her medical conditions and the supporting medical evidence, Ms. Weigand would not be able to reliably perform any occupation on a consistent basis or otherwise earn any percentage of her predisability earnings.

128.    Ms. Weigand reasonably expected that her conditions met the requirements of Disability as defined by the Plan for LTD benefits, and that she would receive benefits under the Plan until age 65 or until she was no longer disabled.

129.    Despite the coverage of Ms. Weigand's disability, Aetna has improperly terminated LTD benefits to Ms. Weigand in breach of the Plan and ERISA.  Aetna's collective conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and was clearly erroneous.

130.    In light of Aetna's structural conflict of interest and wholesale and flagrant procedural violations of ERISA, Ms. Weigand should be entitled to *de novo* review.

131.    On information and belief, Aetna was motivated to terminate Ms. Weigand's claim, in part, because it has a structural conflict of interest; it fully insured benefits under the Plan and also made decisions regarding the payment of benefits.

132.    In terminating Ms. Weigand's LTD benefits, Aetna ignored credible medical evidence, which supported continuing eligibility for benefits. Aetna ignored critical medical records, letters from Ms. Weigand's treating providers, and other relevant information supplied on appeal.

133.    Aetna failed to meaningfully address or consider Ms. Weigand's SSDI award. The only evidence that supported Aetna's position of non-disability was the TSA

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

it had secured from a biased vocational review company, as well as a review from a biased peer review company. Ms. Weigand's conditions had not changed and, in fact, had worsened; she had undergone subsequent procedures for her conditions.

134.  Although not required under the Plan, Ms. Weigand provided objective medical evidence that was consistent with her complaints and supported Disability.

135.  Aetna improperly demanded objective medical evidence of Ms. Weigand's pain and engrafted terms onto the Plan. Nowhere does the Plan require findings of "objective" medical evidence, which is what Aetna instructed Ms. Weigand to provide in the May 20, 2016 denial letter.

136.  Aetna wrongfully denied Ms. Weigand's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

137.  Aetna did not properly consider all of the available evidence when denying Ms. Weigand's benefits. In doing so, Aetna failed to conduct a full and fair review. By way of example, it did not address several medical records and diagnostic testing results or seek clarification from her treating providers before terminating the LTD claim.

138.  Aetna misstated medical evidence for its own financial benefit. It overstated and excessively relied on its own file reviewers. Moreover, Aetna tainted its medical file reviewers in the review process by giving the reviewers inaccurate information regarding Ms. Weigand, while also failing to provide its reviewers with all of the relevant evidence.

139.  Given Ms. Weigand's declining health, she cannot engage in any occupation, sedentary or otherwise.

140.  Aetna, a fiduciary, did not act in Ms. Weigand's best interests.

141.  On information and belief, the peer reviewer, VRC, and Aetna's employees were financially incentivized to terminate Ms. Weigand's claim.

142.  Aetna's peer reviewer, Dr. Rea, arbitrarily reached his opinions based on insufficient evidence or investigation.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

143.    Dr. Rea had no reasonable basis for his recommended restrictions and limitations. He did not personally evaluate Ms. Weigand nor did he perform his due diligence with respect to getting proper clarification from Ms. Weigand's treating providers.

144.    Aetna routinely emphasized reports that favored a denial of benefits while deemphasizing other reports that suggested a contrary conclusion.

145.    Aetna failed to investigate Ms. Weigand's claim adequately, including its failure to conduct an in-person medical evaluation on all relevant medical conditions *prior to* termination, which were necessary to a full and fair review of Ms. Weigand's claim.

146.    Aetna unreasonably withheld relevant documents throughout the entire claim, including *but not limited to* complete internal notes, medical records, and Dr. Rea's report. Aetna's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrates its abuse of discretion and improper claims handling.

147.    Aetna produced multiple versions of the claim file, which were disorganized and inconsistent, requiring significant attorney time to prepare the Complaint.

148.    Aetna failed to properly consider or ascertain the assessments of Ms. Weigand's treating and examining physicians. It also failed to reasonably consider Ms. Weigand's reported symptoms and limitations, and the side effects of her medications, in determining whether she was disabled from any occupation under the Plan.

149.    Aetna knew about Ms. Weigand's worsening issues and additional surgeries before and following the Appeal but failed to give proper weight to those findings. Indeed, Aetna acted arbitrarily and capriciously when it selectively reviewed Ms. Weigand's medical records, relying only on those portions of her medical records that supported a termination of benefits.

150.    On information and belief, Dr. Rea, and the VRC were financially incentivized to terminate Ms. Weigand's claim. Coventry and Reliable Review Services ("RRS") are biased companies, which frequently provide insurance companies with reviews that are favorable for the denial of claims. Aetna's VRC was provided by Coventry, and Dr. Rea was provided by RRS. Aetna knew or should have known that Coventry and RRS are biased companies. As a company-wide practice, Aetna uses Coventry and RRS, because it knows they provide reviews that are favorable to the denial of claims.

151.    Aetna used Coventry and RRS in Ms. Weigand's claim, because it anticipated that the reviews would be unfavorable for the continuation of her benefits.

152.    Aetna unreasonably failed to ensure that Coventry and RRS provided unbiased and/or qualified reviewing doctors for purposes of its claims administration.

153.    Aetna failed to reasonably or coherently explain why it credited the file reviewers over Ms. Weigand's treating physicians.

154.    The file reviewers were not given the Plan or other important records for reaching its decision that Ms. Weigand could perform sedentary work.

155.    Given Ms. Weigand's medical conditions and symptoms, she cannot perform any occupation.

156.    Ms. Weigand has exhausted her administrative remedies.

157.    Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal and state common law, Ms. Weigand is entitled to recover all benefits due under the terms of the Plan, and to enforce her rights under the Plan.

158.    Ms. Weigand is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of her disability benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

159.   Pursuant to 29 U.S.C. § 1132(g), Ms. Weigand is entitled to recover her attorneys' fees and costs incurred herein from Aetna.

160.   Ms. Weigand is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid.

## COUNT II
### (Breach of Fiduciary Duty)

161.   All other paragraphs are incorporated by reference.

162.   Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

163.   Based on the facts of this case, Ms. Weigand has "other equitable relief" available to her in several forms, including but not limited to surcharge, because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Ms. Weigand whole for her losses from Aetna's breaching conduct.

164.   A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position she would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary. In equity, this Court must make Ms. Weigand whole following Aetna's breach of trust and mold the relief necessary to protect the rights of the participant. Therefore, the Court has broad discretion to fashion appropriate relief.

165.   Aetna is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Weigand. Under 29 U.S.C. § 1104(a), Aetna is required discharge its duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a). Under ERISA, which is founded in trust principles, Aetna is required to administer claims in the *best interests* of beneficiaries and participants as part of its fiduciary duty.

166.   In multiple ways throughout the administration of Ms. Weigand's claim,

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

Aetna breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3). Aetna's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because Aetna's claims handling was discharged imprudently and caused Ms. Weigand harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B). By arbitrarily and capriciously terminating Ms. Weigand's benefits, Aetna breached its fiduciary duties. To the extent that Aetna's arbitrary and capricious denial of benefits caused Ms. Weigand harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

167.    Aetna conditions payment of benefits to which claimants are already entitled on execution of a reimbursement agreement.

168.    Aetna provides no additional consideration to participants for execution of the Reimbursement Agreement.

169.    Despite Ms. Weigand having signed the Reimbursement Agreement, Aetna withheld benefits for a period of time.

170.    After Aetna terminated benefits, it breached its fiduciary duty by continuing to enforce its rights under the Reimbursement Agreement to which it had no right under Supreme Court and Ninth Circuit precedent.

171.    On information and belief, Aetna instructs and/or incentivizes certain employee(s) to terminate fully insured LTD claims and appeals based on bias. Ms. Weigand is informed and believes that Aetna's employees are trained in administering claims in the best interests of Aetna, not Plan participants. Aetna demonstrated bias and malice against Ms. Weigand through its employees. Instead of fully and fairly reviewing the medical evidence, Aetna found reasons to terminate Ms. Weigand's claim. Aetna's failure to act prudently and in the best interests of Ms. Weigand is a breach of fiduciary duty requiring appropriate equitable relief following discovery regarding Aetna's conduct as it relates to Ms. Weigand's claim.

172.    Aetna was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Ms. Weigand's benefits for its own profit.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

173.    Aetna encouraged Ms. Weigand to work with Allsup. Allsup is a third-party company that works closely with Aetna on a large number of disability claims administered by Aetna. Ms. Weigand retained Allsup to represent her on her SSDI matter.

174.    On information and belief, Allsup provided constant updates to Aetna regarding Ms. Weigand's SSDI case. Ms. Weigand is informed and believes Allsup is a client of Aetna and has special payment arrangements with Aetna in exchange for Aetna's business. On information and belief, Allsup and Aetna have a contractual relationship, and Allsup is Aetna's agent with fiduciary obligations under ERISA and the Plan.

175.    To effectuate its claim reduction goals, Ms. Weigand is informed and believes Aetna has established a business relationship with Allsup that violates its fiduciary obligations under ERISA and the Plan. Aetna's relationship with Allsup is unknown to claimants. However, Aetna and Allsup led Ms. Weigand to believe that they were acting in her best interests, which was untrue.

176.    Allsup and Aetna communicate frequently on claims in effort for Aetna to gauge its financial liability and potential for overpayment recovery on claims. It did so on Ms. Weigand's claim. Aetna improperly uses information provided by Allsup to approve or deny claims, including but not limited to information related to a claimant's probability of prevailing on her SSDI matter. Aetna uses the information supplied by Allsup to gauge where its insureds are at in the SSDI process and to make strategic termination decisions on otherwise valid claims.

177.    Allsup, as the SSA representative for claimants, acts improperly by serving in Aetna's best interests instead of the best interests of the SSA claimants, including Ms. Weigand. Claimants, including Ms. Weigand, are unaware of the frequent communications between Aetna and Allsup.

178.    Ms. Weigand was harmed by Allsup and Aetna's improper relationship. She relied on Allsup and Aetna to her detriment.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

179.    Aetna should be enjoined from exercising the SSDI offset provisions in the Plan.

180.    Aetna engaged in several procedural violations in an attempt to circumvent its obligations under ERISA, and these violations are by definition under 29 U.S.C. § 1132(a)(3) conduct that can be enjoined by this Court.

181.    ERISA "does not elsewhere adequately remedy" the injuries caused to Ms. Weigand by Aetna's breach of fiduciary duty violations.

182.    As a direct and proximate result of the breaches of fiduciary duty, Ms. Weigand suffered actual, *significant* financial harm and has incurred financial expense.

183.    Ms. Weigand is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid in full.

184.    Pursuant to 29 U.S.C. § 1132(g), Ms. Weigand is entitled to recover her attorneys' fees and costs incurred herein from Aetna.

185.    Ms. Weigand is entitled to enjoin any act or practice by Aetna, which violates ERISA or the Plan, and/or she is entitled to seek other appropriate equitable relief that is traditionally available in equity.

**WHEREFORE**, on all claims, Ms. Weigand prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A.    Past and future LTD benefits under the terms of the Plan;

B.    Clarifying and determining Ms. Weigand's rights to future benefits under the terms of the Plan;

C.    All other equitable relief that is proper as a result of Aetna's breach of fiduciary duties;

D.    An award of Ms. Weigand's attorneys' fees and costs incurred herein;

E.    An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

F.    For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 9th day of June, 2016.

OBER & PEKAS, PLLC

By: *s/ Erin Rose Ronstadt*
Erin Rose Ronstadt
Kevin Koelbel
Attorneys for Plaintiff

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745